**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA**

| | |
|---|---|
| ELIZABETH DREW, Individually and on Behalf of All Others Similarly Situated, | ) ) ) |
| Plaintiff, | ) ) ) |
| v. | ) Case No. ) |
| REYNOLDS AMERICAN INC., SUSAN M. CAMERON, DEBRA A. CREW, JEROME ABELMAN, JOHN BOEHNER, MARTIN D. FEINSTEIN, LUC JOBIN, MURRAY S. KESSLER, HOLLY K. KOEPPEL, JEAN-MARC LEVY, NANA MENSAH, LIONEL L. NOWELL, III, RICARDO OBERLANDER, RONALD S. ROLFE, and JOHN J. ZILLMER, | ) **CLASS ACTION COMPLAINT** ) **FOR VIOLATIONS OF SECTIONS** ) **14(a) AND 20(a) OF THE** ) **SECURITIES EXCHANGE ACT** ) **OF 1934** ) ) **JURY TRIAL DEMANDED** ) ) ) ) |
| Defendants. | ) |

Plaintiff Elizabeth Drew ("Plaintiff"), by her undersigned attorneys, alleges upon personal knowledge with respect to himself, and upon information and belief based upon, *inter alia*, the investigation of counsel as to all other allegations herein, as follows:

## NATURE OF THE ACTION

1.      This action is brought as a class action by Plaintiff on behalf of himself and the other public holders of the common stock of Reynolds American, Inc., ("RAI" or the "Company") against the Company and the members of the Company's board of directors (collectively, the "Board" or "Individual Defendants," and, together with RAI, the "Defendants") for their violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78n(a), 78t(a), SEC Rule 14a-9, 17 C.F.R. 240.14a-9, and Regulation G, 17 C.F.R. § 244.100, in connection with the proposed merger between RAI and British American Tobacco p.l.c. ("BAT").

2. On January 16, 2017, the Board caused the Company to enter into an agreement and plan of merger, which was subsequently amended on June 8, 2017 ("Merger Agreement"). Pursuant to the Merger Agreement, the Company's shareholders stand to receive a number of BAT American Depositary Shares ("BAT ADSs") representing 0.5260 of a BAT ordinary share, in addition to $29.44 in cash for each share of RAI stock they own (the "Merger Consideration"), resulting in an approximate total value of $49 billion (the "Proposed Merger").

3. On June 14, 2017, in order to convince RAI shareholders to vote in favor of the Proposed Merger, the Board authorized the filing of a materially incomplete and misleading Definitive Proxy Statement (the "Proxy") with the Securities and Exchange Commission ("SEC"), in violation of Sections 14(a) and 20(a) of the Exchange Act. The, Board recommends that RAI's shareholders vote in favor of the Proposed Merger and agree to exchange their shares pursuant to the terms of the Merger Agreement based on, among other things, the factors examined by the Board to make its recommendation and the opinion rendered by the Company's financial advisors, Goldman Sachs & Co. LLC, f/k/a Goldman, Sachs & Co. ("Goldman Sachs"), J.P. Morgan Securities LLC ("J.P. Morgan") and Lazard Frères & Co. LLC ("Lazard") (collectively referred to herein as "RAI's Financial Advisors").

4. While Defendants are touting the fairness of the Merger Consideration to the Company's shareholders in the Proxy, they have failed to disclose certain material information that is necessary for shareholders to properly assess the fairness of the

Case 1:17-cv-00547   Document 1   Filed 06/16/17   Page 2 of 27

Proposed Merger, thereby rendering certain statements in the Proxy incomplete and misleading.

5. In particular, the Proxy contains materially incomplete and misleading information concerning: (i) financial projections for the Company; and (ii) the valuation analyses performed by RAI's Financial Advisors in support of their fairness opinions.

6. The special meeting of RAI shareholders to vote on the Proposed Merger is scheduled for July 19, 2017 ("Shareholder Vote"). It is imperative that the material information that has been omitted from the Proxy is disclosed to the Company's shareholders prior to the forthcoming shareholder vote, so that they can properly exercise their corporate suffrage rights, or alternatively opt for appraisal of their shares.

7. For these reasons, and as set forth in detail herein, Plaintiff asserts claims against Defendants for violations of Sections 14(a) and 20(a) of the Exchange Act, and Rule 14a-9 and Regulation G, 17 C.F.R. § 244.100. Plaintiff seeks to enjoin Defendants from holding the shareholder vote on the Proposed Merger and taking any steps to consummate the Proposed Merger unless and until the material information discussed below is disclosed to RAI shareholders sufficiently in advance of the vote on the Proposed Merger or, in the event the Proposed Merger is consummated, to recover damages resulting from the Defendants' violations of the Exchange Act.

## JURISDICTION AND VENUE

8. This Court has subject matter jurisdiction pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331 (federal question jurisdiction) as

Plaintiff alleges violations of Section 14(a) and 20(a) of the Exchange Act.

9.      Personal jurisdiction exists over each Defendant either because the Defendant conducts business in or maintains operations in this District, or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction over Defendant by this Court permissible under traditional notions of fair play and substantial justice.

10.     Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, as well as under 28 U.S.C. § 1391, because: (i) the conduct at issue had an effect in this District; (ii) RAI is incorporated, and maintains its corporate headquarters, in this District; (iii) a substantial portion of the transactions and wrongs complained of herein, including Defendants' primary participation in the wrongful acts detailed herein, occurred in this District; and (iv) Defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## PARTIES

11.     Plaintiff is, and at all relevant times has been, a RAI shareholder.

12.     Defendant RAI is a North Carolina corporation located at 401 North Main Street, Winston-Salem, North Carolina 27101.

13.     Individual Defendant Debra A. Crew has served President and Chief Executive Officer ("CEO") of RAI since January 1, 2017.

14.     Individual Defendant Susan M. Cameron has served as the Company's non-

executive Chairwoman since May 1, 2017.

15.     Individual Defendant Jerome Abelman has served as a Director since February 4, 2016.

16.     Individual Defendant John Boehner has served as a Director since September 15, 2016.

17.     Individual Defendant Martin D. Feinstein has served as a Director since Nov. 30, 2005.

18.     Individual Defendant Luc Jobin has served as a Director Since July 16, 2008.

19.     Individual Defendant Murray S. Kessler has served as a Director since June 12, 2015.

20.     Individual Defendant Holly K. Koeppel has served as a Director since July 16, 2008.

21.     Individual Defendant Jean-Marc Levy has served as a Director since September 15, 2016.

22.     Individual Defendant Nana Mensah has served as a Director since July 30, 2004.

23.     Individual Defendant Lionel L. Nowell, III has served as Lead Independent Director since January 1, 2017.

24.     Individual Defendant Ricardo Oberlander has served as a Director since December 4, 2014.

25.     Individual Defendant Ronald S. Rolfe has served as a Director since May 8, 2014.

26.     Individual Defendant John J. Zillmer has served as a Director since July 12, 2007.

27.     The Individual Defendants and RAI may collectively be referred to as "Defendants."  Each of the Individual Defendants herein is sued individually, and as an aider and abettor, as well as in his or her capacity as an officer and/or director of the Company, and the liability of each arises from the fact that he or she has engaged in all or part of the unlawful acts, plans, schemes, or transactions complained of herein.

<u>**CLASS ACTION ALLEGATIONS**</u>

28.     Plaintiff brings this class action pursuant to Fed. R. Civ. P. 23 on behalf of himself and the other public shareholders of RAI (the "Class").  Excluded from the Class are Defendants herein and any person, firm, trust, corporation, or other entity related to or affiliated with any Defendant.

29.     This action is properly maintainable as a class action because:

        a.     The Class is so numerous that joinder of all members is impracticable. As of June 12, 2017, there were approximately 1,426,422,676 shares of RAI common stock outstanding.[1]  The actual number of public shareholders of RAI will be ascertained through discovery;

------

[1] At the special meeting on July 19, 2017, each holder of RAI common stock will be entitled to cast one vote per such share.  Proxy at 202.

b.      There are questions of law and fact that are common to the Class that predominate over any questions affecting only individual members, including the following:

　　　　　　　　i)      whether Defendants have misrepresented or omitted material information concerning the Proposed Merger in the Proxy in violation of Section 14(a) of the Exchange Act;

　　　　　　　　ii)     whether the Individual Defendants have violated Section 20(a) of the Exchange Act; and

　　　　　　　　iii)    whether Plaintiff and other members of the Class will suffer irreparable harm if compelled to vote their shares regarding the Proposed Merger based on the materially incomplete and misleading Proxy.

c.      Plaintiff is an adequate representative of the Class, has retained competent counsel experienced in litigation of this nature, and will fairly and adequately protect the interests of the Class;

d.      Plaintiff's claims are typical of the claims of the other members of the Class and Plaintiff does not have any interests adverse to the Class;

e.      The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class, which would establish incompatible standards of conduct for the party opposing the Class;

f.      Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole; and

g.      A class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

## SUBSTANTIVE ALLEGATIONS

**I.      Background of the Proposed Merger**

30.     RAI, the parent company of the RAI Group (which consists of RAI and its subsidiaries), is a holding company whose wholly-owned operating subsidiaries include the second largest tobacco company in the United States, RJR Tobacco Company; SFNTC, the manufacturer and marketer of the NATURAL AMERICAN SPIRIT brand of cigarettes and other tobacco products in the United States; the second largest smokeless tobacco products manufacturer in the United States, American Snuff Company, LLC; R. J. Reynolds Vapor Company, referred to as RJR Vapor, a marketer of digital vapor cigarettes in the United States; Niconovum USA, Inc. and Niconovum AB, marketers of nicotine replacement therapy products in the United States and Sweden, respectively; and others. Proxy at 19.  RAI's common stock trades on the New York Stock Exchange ("NYSE") under the ticker symbol "RAI."

31.     RAI's reportable operating segments include the RJR Tobacco segment, the Santa Fe segment and the American Snuff segment:

> The RJR Tobacco segment consists of the primary operations of RJR Tobacco Company and includes three of the top four best-selling cigarettes

in the United States: NEWPORT, CAMEL and PALL MALL. These brands, and RJR Tobacco's other brands, including DORAL, MISTY and CAPRI, are manufactured in a variety of styles and marketed in the United States. As part of its total tobacco strategy, RJR Tobacco offers a smokeless tobacco product, CAMEL Snus. RJR Tobacco manages contract manufacturing of cigarettes and tobacco products through arrangements with BAT affiliates, and manages the export of tobacco products to U.S. territories, U.S. duty-free shops, and U.S. overseas military bases. In the United States, RJR Tobacco also manages the premium cigarette brands DUNHILL, which RJR Tobacco Company licenses from the BAT Group, and STATE EXPRESS 555, which RJR Tobacco Company licenses from CTBAT International Co. Ltd., referred to as CTBAT, a joint venture between the BAT Group and China National Tobacco Corporation, referred to as CNTC.

The Santa Fe segment consists of the primary operations of SFNTC and includes the manufacturing and marketing of premium cigarettes and other tobacco products under the NATURAL AMERICAN SPIRIT brand in the United States.

The American Snuff segment consists of the primary operations of American Snuff Company, LLC. American Snuff is the second largest smokeless tobacco products manufacturer in the United States, and offers adult tobacco consumers a range of differentiated smokeless tobacco products, primarily moist snuff. The moist snuff category is divided into premium, price-value and popular-price brands. American Snuff's primary brands include its largest selling moist snuff brands, GRIZZLY, in the price-value category, and KODIAK, in the premium category.

Proxy at 19-20.

32. On October 20, 2016, BAT submitted proposal to RAI to acquire all of the outstanding shares of RAI common stock not owned by the subsidiaries of BAT ("BAT Group") for a purchase price per share of RAI common stock consisting of 0.5502 of a BAT ordinary share and $24.13 in cash (the "October 20 Proposal"). Proxy at 45. On October 28, 2016, the Board held a meeting with RAI management, and others, and established the "Transaction Committee," to which the Board delegated the power and

authority to, among other things, evaluate, discuss and negotiate the terms and conditions of, approve, recommend and/or reject (1) the October 20 Proposal (and any subsequent revision thereto), (2) any other potential transaction with BAT, and (3) any potential alternative strategic transaction. Proxy at 45.

33.     According to the Proxy, BAT currently holds approximately 42% of RAI's outstanding common stock through its wholly owned subsidiaries, Brown & Williamson Holdings, Inc., a Delaware corporation and indirect, wholly owned subsidiary of BAT ("B&W"), and Louisville Securities Limited, a private limited company incorporated under the laws of England and Wales and an indirect, wholly owned subsidiary of BAT ("Louisville").

34.     RAI, BAT, and B&W are parties to a governance agreement pursuant to which entry into the transactions contemplated by the merger agreement, including the merger, requires the approval of a majority of the independent directors of RAI other than directors designated for nomination by B&W.

35.     On December 14, 2016, RAI and BAT entered into a mutual non-disclosure agreement ("NDA"), which, in the case of BAT, supplemented its existing obligations under the governance agreement.

36.     After subsequent negotiation, on January 10, 2017, BAT informed RAI it would be willing to increase its proposal to acquire all of the outstanding shares of RAI common stock not owned by the BAT Group for a purchase price per share of RAI common stock consisting of 0.5260 of a BAT ordinary share and $29.44 in cash.

37.     On January 16, 2017, the Board unanimously approved the Proposed Merger.

## II.     The Proposed Merger

38.     On January 17, 2017, the Company issued a press release announcing the

Proposed Merger which stated the following, in relevant part:

> WINSTON-SALEM, N.C. – Jan. 17, 2017 – Reynolds American Inc.
> (NYSE: RAI) today announced that it has reached an agreement with British
> American Tobacco p.l.c. (LSE: BATS) under which BAT will acquire the
> 57.8% of RAI common stock that BAT does not currently own for $29.44
> per share in cash and a number of BAT American Depositary Shares
> representing 0.5260 of a BAT ordinary share, currently worth $30.20 per
> share based on the BAT closing share price as of January 16, 2017, and the
> corresponding Dollar-Sterling exchange rate.
>
> The per-share price represents a 26.4% premium to RAI's closing price as of
> October 20, 2016, the day prior to BAT's public proposal to acquire the
> outstanding shares that BAT does not currently own.  Under the terms of the
> agreement, RAI shareholders will receive for each share of RAI common
> stock they own, $29.44 in cash and a number of BAT American Depositary
> Shares representing 0.5260 of a BAT ordinary share.  The BAT American
> Depositary Shares will be listed on the New York Stock Exchange.  RAI
> shareholders will own approximately 19% of the combined company.
>
> The transaction has been approved by the independent directors of RAI who
> formed a transaction committee to negotiate with BAT, given BAT's existing
> ownership stake and representation on RAI's board of directors, and by the
> boards of directors of both companies.
>
> Following the transaction, the combined companies become a stronger, truly
> global tobacco and Next Generation Products company, delivering sustained
> long-term profit growth and returns.  It will maintain a presence in both
> profitable developed and high-growth developing markets while bringing
> together a compelling and complementary global portfolio of strong brands
> including Newport, Kent and Pall Mall.  The companies' combined next-
> generation product development and R&D capabilities will create an
> innovative pipeline of vapor and tobacco-heating products, delivering both
> an array of new product options for adult tobacco consumers, as well as
> diversified sources of profit growth opportunities for investors.

"Through this transaction, we form an industry leader that will focus on innovation and brand building," said Susan M. Cameron, executive chairman of Reynolds American's board of directors. "This combination will create a truly global tobacco company with multiple iconic tobacco brands, and a world-class pipeline of next generation vapor and tobacco-heating products."

"The transaction delivers significant value to RAI shareholders, and the independent directors on the transaction committee have unanimously voted in favor of the transaction," said Lionel L. Nowell, III, lead independent director of Reynolds American's board of directors. "This is an agreement that offers a compelling premium to shareholders, as well as continued ownership in a company that is well-positioned for long-term success."

"We look forward to bringing together the two companies' highly complementary cultures and shared commitment to innovation and transformation in our industry," said Debra A. Crew, Reynolds American's president and chief executive officer. "British American Tobacco is the best partner for Reynolds American's next phase of growth, and together the two companies will create the leading portfolio of tobacco and next generation products for adult tobacco consumers."

"We are very pleased to have reached agreement with the board of Reynolds American as we believe that the combination of our two great companies has a very compelling strategic and financial logic that will provide a lasting benefit to shareholders, employees and all other stakeholders," said Nicandro Durante, British American Tobacco's chief executive officer. "This transaction will not only create a truly global business with a world-class portfolio of tobacco and next-generation products, but will also benefit from the highly talented and experienced employees in both organizations. We believe that this will drive long-term sustainable profit growth for the benefit of all shareholders."

British American Tobacco has a strong track record of successfully integrating acquisitions and remains committed to Reynolds American's U.S. workforce and manufacturing facilities.

The cash component of the transaction will be financed by a combination of existing cash resources, new bank credit lines and the issuance of new bonds. A $25bn acquisition facility has been entered into with a syndicate of banks to provide financing certainty. The acquisition facility comprises $15bn and $5bn bridge loans with 1- and 2-year maturities respectively, each with two six-month extensions available at BAT's option. In addition, the facility

includes two $2.5bn term loans with maturities of 3 and 5 years. BAT intends to refinance the bridge loans through capital market debt issuances in due course.

The transaction is subject to shareholder approval from both Reynolds American and BAT shareholders, as well as regulatory approvals and other customary closing conditions. The transaction is expected to close in the third quarter of 2017.

39.     Subsequently, on June 8, 2017, RAI issued a press release announcing and

amendment to the Proposed Merger, which stated in pertinent part:

On January 16, 2017, Reynolds American Inc., referred to as RAI, British American Tobacco p.l.c., referred to as BAT, BATUS Holdings Inc., a wholly owned subsidiary of BAT and referred to as BATUS, and Flight Acquisition Corporation, a wholly owned subsidiary of BAT and referred to as Merger Sub, entered into an Agreement and Plan of Merger, referred to as the Merger Agreement, pursuant to which, subject to the satisfaction or waiver of certain conditions, Merger Sub will merge with and into RAI, referred to as the merger, with RAI surviving as a wholly owned subsidiary of BAT.

*Amendment to Merger Agreement*

On June 8, 2017, RAI, BAT, BATUS and Merger Sub entered into the Amendment to Agreement and Plan of Merger, referred to as the Amendment, which amends the previously announced Merger Agreement.

Under the terms of the Amendment, upon the completion of the merger, the Restated Articles of Incorporation of RAI will be amended to provide for a minimum of one director instead of a minimum of nine directors. In addition, the Amendment amends the Merger Agreement to provide that, as of the Effective Time (as defined in the Merger Agreement), BAT, on behalf of BATUS, will provide irrevocable written instruction to cause the American Depositary Shares of BAT, referred to as the BAT ADSs, to be issued as the stock portion of the Merger Consideration (as defined in the Merger Agreement) to be deposited with or provided to the Exchange Agent (as defined in the Merger Agreement), instead of requiring deposit of such BAT ADSs as of the Effective Time. Further, the Amendment amends the Merger Agreement to grant the Exchange Agent an additional two business days, for a total of five business days, to mail out to certain holders of shares of RAI

- 13 -

common stock held in book-entry form: (1) a notice of the effectiveness of the merger, (2) a statement reflecting the whole number of BAT ADSs in the name of such holder that such holder has the right to receive as Merger Consideration, and (3) an amount in cash that such holder has the right to receive as Merger Consideration.

Other than as expressly modified pursuant to the Amendment, the Merger Agreement, which was filed as Exhibit 2.1 to RAI's Form 8-K filed with the Securities and Exchange Commission, referred to as the SEC, on January 17, 2017, remains in full force and effect as originally executed on January 16, 2017. The foregoing description of the Amendment and the transactions contemplated thereby does not purport to be complete and is subject to, and qualified in its entirety by, the full text of the Amendment, a copy of which is being filed as Exhibit 2.1 hereto and is incorporated into this Item 1.01 by reference.

## III. The Merger Consideration Appears Inadequate in Light of RAI's Recent Financial Performance and Growth Prospects

40. The Merger Consideration appears inadequate in light of the Company's recent financial performance and prospects for future growth. Indeed, the Company reported adjusted earnings per share at $0.62 in the fourth fiscal quarter of 2016, up 29.2 percent from the same quarter of the previous year; and $2.31 for the full year, up 16.7 percent from the previous year. All reportable business segments demonstrated excellent financial performance, with the retail market share of total cigarette drive brands up to 32.0 percent. To round out its excellent quarter, the Company announced a 10.9 percent dividend increase.

41. Success continued into the new year, with the Company reporting adjusted earnings per share at $0.56 in the first fiscal quarter of 2017, up 12.0 percent from the same quarter of the previous year. Reynolds' Santa Fe and American Snuff operating companies delivered strong double-digit increases in operating income. Finally, Reynolds submitted

modified risk tobacco product applications to U.S. FDA for its successful smokeless tobacco product, Camel Snus.

42.     In sum, it appears that RAI is well-positioned for financial growth, and that the Merger Consideration fails to adequately compensate the Company's shareholders.  It is imperative that Defendants disclose the material information they have omitted from the Proxy, discussed in detail below, so that the Company's shareholders can properly assess the fairness of the Merger Consideration for themselves and make an informed decision concerning whether or not to vote in favor of the Proposed Merger.

## IV.     The Materially Incomplete and Misleading Proxy

43.     On June 14, 2017, Defendants caused the Proxy to be filed with the SEC in connection with the Proposed Merger.  The Proxy solicits the Company's shareholders to vote in favor of the Proposed Merger.  Defendants were obligated to carefully review the Proxy before it was filed with the SEC and disseminated to the Company's shareholders to ensure that it did not contain any material misrepresentations or omissions.  Indeed, the Company explicitly acknowledged that the financial forecasts provided in the Proxy for both RAI and BAT were "prepared by, and are the responsibility of, RAI's management." Proxy at 108.  However, the Proxy misrepresents and/or omits material information that is necessary for the Company's shareholders to make an informed decision concerning whether to vote in favor of the Proposed Merger, in violation of Sections 14(a) and 20(a) of the Exchange Act.

44.     First, the Proxy fails to provide material information concerning the Company's and BAT's financial projections.  Specifically, the Proxy provides non-GAAP (generally accepted accounting principles) metrics but fails to define the non-GAAP metrics and fails to provide line item projections for the metrics used to calculate these non-GAAP measures or otherwise reconcile the non-GAAP projections to the most comparable GAAP measures.

45.     The Proxy discloses the Company's operating cash flows, yet fails to provide a definition for that metric, fails to provide the line items that were used to calculate operating cash flows, and also fails to provide a reconciliation to the most comparable GAAP measure.

46.     In order to make the projections for RAI included on pages 109-110 of the Proxy materially complete and not misleading, Defendants must provide: (i) definitons for the undefined metrics; (ii) the line items used to calculate those metrics; and (iii) a reconciliation table of the non-GAAP measures to the most comparable GAAP measures.

47.     When a company discloses non-GAAP financial measures in a Proxy, the Company must also disclose all projections and information necessary to make the non-GAAP measures not misleading, and must provide a reconciliation (by schedule or other clearly understandable method) of the differences between the non-GAAP financial measure disclosed or released with the most comparable financial measure or measures calculated and presented in accordance with GAAP.  17 C.F.R. § 244.100.

48.     Indeed, the SEC has recently increased its scrutiny of the use of non-GAAP financial measures in communications with shareholders.  The former SEC Chairwoman, Mary Jo White, recently stated that the frequent use by publicly traded companies of unique company-specific non-GAAP financial measures (as RAI included in the Proxy here), implicates the centerpiece of the SEC's disclosures regime:

> In too many cases, the non-GAAP information, which is meant to supplement the GAAP information, has become the key message to investors, crowding out and effectively supplanting the GAAP presentation.  Jim Schnurr, our Chief Accountant, Mark Kronforst, our Chief Accountant in the Division of Corporation Finance and I, along with other members of the staff, have spoken out frequently about our concerns to raise the awareness of boards, management and investors.   And last month, the staff issued guidance addressing a number of troublesome practices *which can make non-GAAP disclosures misleading*: the lack of equal or greater prominence for GAAP measures; exclusion of normal, recurring cash operating expenses; individually tailored non-GAAP revenues; lack of consistency; cherry-picking; and the use of cash per share data.  I strongly urge companies to carefully consider this guidance and revisit their approach to non-GAAP disclosures.  I also urge again, as I did last December, that appropriate controls be considered and that audit committees carefully oversee their company's use of non-GAAP measures and disclosures.[2]

49.     The SEC has repeatedly emphasized that disclosure of non-GAAP projections can be inherently misleading, and has therefore heightened its scrutiny of the use of such projections.[3]  Indeed, on May 17, 2016, the SEC's Division of Corporation

---

[2] Mary Jo White, *Keynote Address, International Corporate Governance Network Annual Conference: Focusing the Lens of Disclosure to Set the Path Forward on Board Diversity, Non-GAAP, and Sustainability* (June 27, 2016), https://www.sec.gov/news/speech/chair-white-icgn-speech.html.

[3] *See, e.g.*, Nicolas Grabar and Sandra Flow, *Non-GAAP Financial Measures: The SEC's Evolving Views*, Harvard Law School Forum on Corporate Governance and Financial

Finance released new and updated Compliance and Disclosure Interpretations ("C&DIs") on the use of non-GAAP financial measures that demonstrate the SEC's tightening policy.[4] One of the new C&DIs regarding forward-looking information, such as financial projections, explicitly requires companies to provide any reconciling metrics that are available without unreasonable efforts.

50.     At the very least, the Company must disclose the line item projections for the financial metrics that were used to calculated the non-GAAP measures.  Such projections are necessary to make the non-GAAP projections included in the Proxy not misleading.  Indeed, the Defendants acknowledge that disclosing non-GAAP projections may mislead shareholders in the Proxy:

> The unaudited financial forecasts were not prepared for the purpose of public disclosure, nor were they prepared in compliance with published guidelines of the SEC, the guidelines established by the American Institute of Certified Public Accountants for preparation and presentation of financial forecasts, U.S. GAAP or IFRS.  The summary of the unaudited financial forecasts is not being included in this proxy statement/prospectus to influence RAI shareholders with respect to the approval of the merger agreement, but because the unaudited financial forecasts were furnished to the Transaction Committee, the RAI board of directors, Goldman Sachs, J.P. Morgan, Lazard and BAT.  The inclusion of the unaudited financial forecasts in this proxy statement/prospectus should not be regarded as an indication that RAI or any other recipient of the unaudited financial forecasts considered, or now

---

Regulation (June 24, 2016), https://corpgov.law.harvard.edu/2016/06/24/non-gaap-financial-measures-the-secs-evolving-views/; Gretchen Morgenson, *Fantasy Math Is Helping Companies Spin Losses Into Profits*, N.Y. Times, Apr. 22, 2016, http://www.nytimes.com/2016/04/24/business/fantasy-math-is-helping-companies-spin-losses-into-profits.html?_r=0.

[4] *Non-GAAP Financial Measures, Compliance & Disclosure Interpretations*, U.S. SECURITIES AND EXCHANGE COMMISSION (May 17, 2017), https://www.sec.gov/divisions/corpfin/guidance/nongaapinterp.htm.

considers, the forecasts to be necessarily predictive of actual future results, and the unaudited financial forecasts should not be relied upon as such because of the inherent risks and uncertainties associated with such long-range forecasts.

Proxy at 108.

51.     The Proxy also omits certain key inputs necessary for shareholders to assess the valuation analyses performed by RAI's Financial Advisors in support of their fairness opinions, rendering the summaries of such analyses in the Proxy incomplete and misleading.

52.     With respect to Goldman Sach's Illustrative Discounted Cash Flow Analysis, the Proxy fails to define the non-GAAP measure projected cash flows. Proxy at 73. The Proxy also fails to disclose the inputs and assumptions underlying the range of perpetuity growth rate of -0.5% to 0.5%. This information is material to RAI shareholders and its omission renders the summary of Goldman Sach's Illustrative Discounted Cash Flow Analysis incomplete and misleading.

53.     Additionally, while the Proxy disclosed that Goldman Sachs performed financial advisory and/or underwriting services to RAI within the last two years and also discloses the amount of compensation earned by Goldman Sachs for its services, the Proxy fails to make a comparable disclosure for BAT. Specifically, while the Proxy disclosed that Goldman Sachs performed financial advisory and/or underwriting services for BAT within the last two years, the Proxy fails to disclose the compensation received by Goldman Sachs. Proxy at 77. This information is material to RAI shareholders and its omission further renders the Proxy incomplete and misleading.

54.     With respect to J.P. Morgan's Discounted Cash Flow Analysis for both RAI and BAT, the Proxy fails to define unlevered free cash flows.  The Proxy also fails to disclose the inputs and assumptions underlying the range of perpetuity growth rate of 0.0% to 1.0% when performing the Discount Cash Flow Analysis for both RAI and BAT. Further, with respect to BAT, the Proxy fails to clarify whether the unlevered free cash flows referenced on page 88 are the same unlevered free cash flows referenced on page 111.  This information is material to RAI shareholders and its omission renders the summary of J.P. Morgan's Discounted Cash Flow Analysis incomplete and misleading.

55.     With respect to Lazard's Discounted Cash Flow Analysis, the Proxy discloses the calculation for unlevered, after-tax free cash flows for both RAI and BAT, yet fails to provide the (i) line items used to calculate those values for both companies; and (ii) the value of the unlevered, after-tax free cash flows for both companies. Specifically, the line item projections that were utilized to calculate unlevered, after-tax free cash flows include (i) the net operating profit after tax (representing earnings before interest after tax), (ii) depreciation and amortization, (iii) capital expenditures, and (iv) changes in working capital and other cash flow items.  The Proxy also fails to disclose the inputs and assumptions underlying the range of perpetuity growth rate of -0.5% to 0.5%.  This information is material to RAI shareholders and its omission renders the summary of Lazard's Discounted Cash Flow Analysis incomplete and misleading.

56.     In sum, the omission of the above-referenced information renders statements in the Proxy materially incomplete and misleading, in contravention of the Exchange Act.

Absent disclosure of the foregoing material information prior to the special shareholder meeting to vote on the Proposed Merger, Plaintiff and the other members of the Class will be unable to make a fully-informed decision regarding whether to vote in favor of the Proposed Merger, and they are thus threatened with irreparable harm, warranting the injunctive relief sought herein.

## COUNT I

**(Against All Defendants for Violations of Section 14(a) of the Exchange Act and Rule 14a-9 and 17 C.F.R. § 244.100 Promulgated Thereunder)**

57.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

58.     Section 14(a)(1) of the Exchange Act makes it "unlawful for any person, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 78l of this title."  15 U.S.C. § 78n(a)(1).

59.     Rule 14a-9, promulgated by the SEC pursuant to Section 14(a) of the Exchange Act, provides that Proxy communications with shareholders shall not contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading."  17

C.F.R. § 240.14a-9.

60. SEC Regulation G has two requirements: (1) a general disclosure requirement; and (2) a reconciliation requirement. The general disclosure requirement prohibits "mak[ing] public a non-GAAP financial measure that, taken together with the information accompanying that measure, contains an untrue statement of a material fact or *omits to state a material fact necessary in order to make the presentation of the non-GAAP financial measure…not misleading*." 17 C.F.R. § 244.100(b). The reconciliation requirement requires an issuer that chooses to disclose a non-GAAP measure to provide a presentation of the "most directly comparable" GAAP measure, and a reconciliation "by schedule or other clearly understandable method" of the non-GAAP measure to the "most directly comparable" GAAP measure. 17 C.F.R. § 244.100(a). As set forth above, the Proxy omits information required by SEC Regulation G, 17 C.F.R. § 244.100.

61. The omission of information from a proxy statement will violate Section 14(a) and Rule 14a-9 if other SEC regulations specifically require disclosure of the omitted information.

62. Defendants have issued the Proxy with the intention of soliciting shareholder support for the Proposed Merger. Each of the Defendants reviewed and authorized the dissemination of the Proxy, which fails to provide critical information regarding, amongst other things: (i) financial projections for the Company; and (ii) the valuation analyses performed by Goldman Sachs, J.P. Morgan, and Lazard in support of its fairness opinions.

63. In so doing, Defendants made untrue statements of fact and/or omitted

material facts necessary to make the statements not misleading. Each of the Individual Defendants, by virtue of their roles as officers and/or directors, were aware of the omitted information but failed to disclose such information, in violation of Section 14(a). The Individual Defendants were therefore negligent, as they had reasonable grounds to believe material facts existed that were misstated or omitted from the Proxy, but nonetheless failed to obtain and disclose such information to shareholders although they could have done so without extraordinary effort.

64.    The Individual Defendants knew or were negligent in not knowing that the Proxy is materially misleading and omits material facts that are necessary to render it not misleading. The Individual Defendants undoubtedly reviewed and relied upon the omitted information identified above in connection with their decision to approve and recommend the Proposed Merger. Indeed, the Proxy states that Goldman Sachs, J.P. Morgan and Lazard reviewed and discussed its financial analyses with the Board, and further states that the Board considered both the financial analyses provided by Goldman Sachs, J.P. Morgan and Lazard as well as their fairness opinions and the assumptions made and matters considered in connection therewith.

65.    The Individual Defendants knew or were negligent in not knowing that the material information identified above has been omitted from the Proxy, rendering the sections of the Proxy identified above to be materially incomplete and misleading. Indeed, the Individual Defendants were required to review the analyses of Goldman Sachs, J.P. Morgan, and Lazard, in connection with their receipt of the fairness opinion, question

Goldman Sachs', J.P. Morgan's and Lazard's derivation of fairness, and be particularly attentive to the procedures followed in preparing the Proxy and review it carefully before it was disseminated, to corroborate that there are no material misstatements or omissions.

66.     The Individual Defendants were, at the very least, negligent in preparing and reviewing the Proxy.  The preparation of a proxy statement by corporate insiders containing materially false or misleading statements or omitting a material fact constitutes negligence. The Individual Defendants were negligent in choosing to omit material information from the Proxy or failing to notice the material omissions in the Proxy upon reviewing it, which they were required to do carefully as the Company's directors.  Indeed, the Individual Defendants were intricately involved in the process leading up to the signing of the Merger Agreement and the preparation of the Company's financial projections.

67.     RAI is also deemed negligent as a result of the Individual Defendants' negligence in preparing and reviewing the Proxy.

68.     The misrepresentations and omissions in the Proxy are material to Plaintiff and the Class, who will be deprived of their right to cast an informed vote if such misrepresentations and omissions are not corrected prior to the vote on the Proposed Merger.

69.     Plaintiff and the Class have no adequate remedy at law.  Only through the exercise of this Court's equitable powers can Plaintiff and the Class be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## COUNT II

### (Against the Individual Defendants for Violations of Section 20(a) of the Exchange Act)

70.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

71.     The Individual Defendants acted as controlling persons of RAI within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their positions as officers and/or directors of RAI, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the incomplete and misleading statements contained in the Proxy filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements that Plaintiff contends are materially incomplete and misleading.

72.     Each of the Individual Defendants was provided with or had unlimited access to copies of the Proxy and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

73.     In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the Exchange Act violations alleged herein, and exercised the same.  The Proxy at issue contains the unanimous recommendation of each of the Individual Defendants to approve

the Proposed Merger.  They were thus directly involved in preparing this document.

74.     In addition, as the Proxy sets forth at length, and as described herein, the Individual Defendants were involved in negotiating, reviewing, and approving the Merger Agreement.  The Proxy purports to describe the various issues and information that the Individual Defendants reviewed and considered.  The Individual Defendants participated in drafting and/or gave their input on the content of those descriptions.

75.     By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

76.     As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) and Rule 14a-9 by their acts and omissions as alleged herein.  By virtue of their positions as controlling persons, these Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of Individual Defendants' conduct, Plaintiff and the Class will be irreparably harmed.

77.     Plaintiff and the Class have no adequate remedy at law.  Only through the exercise of this Court's equitable powers can Plaintiff and the Class be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for judgment and relief as follows:

A.     Declaring that this action is properly maintainable as a Class Action and certifying Plaintiff as Class Representative and his counsel as Class Counsel;

B.      Enjoining Defendants and all persons acting in concert with them from proceeding with the shareholder vote on the Proposed Merger or consummating the Proposed Merger, unless and until the Company discloses the material information discussed above which has been omitted from the Proxy;

C.      Directing the Defendants to account to Plaintiff and the Class for all damages sustained as a result of their wrongdoing;

D.      Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and expert fees and expenses;

E.      Granting such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

Dated: June 16, 2017

Respectfully submitted,
**WARD BLACK LAW**

By: /s/ Janet Ward Black

Janet Ward Black
NC State Bar 12869
Nancy Meyers
NC State Bar 23339
208 West Wendover Ave.
Greensboro, North Carolina 27401-1307
Tel.: (336) 333-2244
Fax: (336) 379-9415
Email: jwblack@wardblacklaw.com
        nmeyers@wardblacklaw.com

*Attorneys for Plaintiff*

**OF COUNSEL:**

**FARUQI & FARUQI, LLP**
James M. Wilson, Jr. (*pro hac* forthcoming)
Nadeem Faruqi
685 Third Avenue, 26th Fl.
New York, NY 10017
Telephone: (212) 983-9330
Facsimile: (212) 983-9331
Email: nfaruqi@faruqilaw.com
        jwilson@faruqilaw.com

*Attorneys for Plaintiff*